

# IN THE COURT OF CRIMINAL APPEALS
# OF TEXAS

## NO. AP-75,901

**ROSENDO RODRIGUEZ, III, Appellant**

**v.**

**THE STATE OF TEXAS**

### ON DIRECT APPEAL
### FROM CAUSE NO. 2005-410,654 IN THE 140th DISTRICT COURT
### LUBBOCK COUNTY

**KEASLER, J., delivered the opinion for a unanimous Court.**

## O P I N I O N

Rosendo Rodriguez, III, was convicted in March 2008 of capital murder.[1]  Based on

the jury's answers to the special issues set forth in Texas Code of Criminal Procedure Article

37.071, Sections 2(b) and 2(e), the trial judge sentenced Rodriguez to death.[2]  Direct appeal

---

[1]  TEX. PENAL CODE § 19.03(a)(2), (a)(7)(A).

[2]  TEX. CODE CRIM. PROC. art. 37.071 § 2(g).

to this Court is automatic.[3]  After reviewing Rodriguez's forty-two points of error, we find them to be without merit.  Consequently, we affirm the trial court's judgment and sentence of death.

## Sufficiency of the Evidence

Rodriguez was charged with two alternative theories of capital murder: (1) murder in the course of committing or attempting to commit aggravated sexual assault,[4] and (2) murder of the victim and her unborn child during the same criminal transaction.[5]  Rodriguez challenges the sufficiency of the evidence at both phases of trial.  We shall address these issues first.

### Guilt-Phase

In September 2005, the victim, Summer Baldwin, a drug-addicted prostitute, lived in Lubbock.  Baldwin was ten weeks' pregnant, although few knew of the pregnancy and there were no outward signs that she was pregnant.

On Sunday, September 11, 2005, Margie Estrada saw Baldwin during the late evening hours at a 7-Eleven store across from the convention-center area Holiday Inn in downtown Lubbock.  Baldwin was seated in the passenger's seat of a new, red four-door pick-up truck driven by an Hispanic or white male with a short military haircut.  Baldwin got into Estrada's

---

[3]  TEX. CODE CRIM. PROC. art. 37.071 § 2(h).

[4]  TEX. PENAL CODE § 19.03(a)(2).

[5]  TEX. PENAL CODE § 19.03(a)(7)(A).

truck and told Estrada that the man in the red truck was her "client" and that they had been together using drugs. Baldwin did not have any visible bruises or injuries at that time. Baldwin returned to the man in the red truck. Estrada never saw Baldwin again.

On September 13, 2005, Baldwin's severely abused body was discovered folded up inside a new Protégé-brand suitcase at the Lubbock City landfill. Baldwin had been killed on September 12, 2005, in the early morning hours, not long after Estrada saw her at the 7-Eleven store. Baldwin's wallet, with no money in it, was found in a trash dumpster on September 14th.

Rodriguez, an Hispanic male with a short military haircut, was in Lubbock for training as part of his duties as a member of the United States Marine Corps Reserve. His weekend training included, among other things, combat fighting through martial arts instruction. Rodriguez checked into the convention-center Holiday Inn on Friday, September 9, 2005, although the rest of his Reserve unit was registered to stay at a different Holiday Inn several miles away. Rodriguez checked in under the name of "Thomas Rodriguez." Rodriguez arrived in a new, red four-door pick-up truck, which he had rented from Enterprise.

Chris Rodriguez, Rodriguez's friend and former Chi Rho fraternity brother at Texas Tech University, learned that Rodriguez was in Lubbock and called Rodriguez on Saturday, September 10th, to make plans to go out that night. Rodriguez told Chris that he already had a date for the evening, so Chris called him the next day, and they agreed to meet at Chris's apartment before going to see a movie that night.

On Sunday evening, September 11th, Rodriguez met with Chris, Chris's girlfriend, and some others at Chris's apartment. Rodriguez told everyone that he served in Iraq; he described killing a young child in Iraq and having sex with various Iraqi "girls," including prostitutes. But Rodriguez never served in Iraq.

Chris and Rodriguez left for the movie, which was showing at around 10:30 p.m., but discovered that it was sold out. They decided to go to a bar instead; both consumed several drinks. Rodriguez continued to discuss his experiences in Iraq. Rodriguez drove Chris home sometime around 12:45 a.m.

The Holiday Inn room-key records show that Rodriguez entered his room several times during the following hours: around 1:50 a.m., 3:00 a.m., 3:45 a.m., and 7:30 a.m. Lubbock police determined that the Protégé-brand suitcase in which Baldwin's body was found was purchased with Rodriguez's debit card at a nearby Walmart, along with some latex gloves, on September 12th at approximately 3:30 a.m. A store surveillance video showed a man matching Rodriguez's description purchasing a suitcase at the Walmart; he did not appear panicked or in a hurry.

Rodriguez called Chris on Monday to see about getting together, but Chris was working and could not meet Rodriguez, so they made plans for Wednesday evening. While talking on the phone, Rodriguez and Chris recalled their activities of the previous night and laughed about having too much to drink. Chris attempted to contact Rodriguez on Wednesday but Rodriguez never answered his phone. Instead of meeting with Chris,

Rodriguez checked out of the Holiday Inn, returned the rented truck, and took a bus home to San Antonio.

Once home, Rodriguez searched internet news stories on Baldwin's death, searched for his own name on at least one of the news sites, and also searched online singles web sites for young women.

On September 15th, Lubbock detectives searched the room in which Rodriguez had stayed at the Holiday Inn. They found a dried pool of Baldwin's blood on the carpet next to the bed farthest from the door and blood spatter on the box springs and mattress. Walmart bags, a Protégé suitcase registration card, a condom wrapper, and two sets of latex rubber gloves were found in a trash container in the hallway down from the room. Rodriguez could not be excluded as the donor of the DNA on the latex gloves.

Rodriguez was arrested on September 15th. He had no apparent injuries other than some scratch marks on his left arm. He chose not to speak with officers at that time.

A month after the murder, Rodriguez, accompanied by counsel, gave a statement to the police. Rodriguez admitted that he had spent time with Baldwin. He stated that he met Baldwin on Saturday evening, September 10th, around 10:00 p.m. He said that he was driving down a dark street when he saw Baldwin walking in the same direction that he was driving. He noticed that she was crying, so he pulled over. After letting her get cleaned up at his hotel room, he drove her home. He claimed that he did not know that Baldwin was a prostitute.

He picked Baldwin up again on Sunday night/Monday morning. He claimed that they had consensual vaginal and anal intercourse while she laid on her back. He stated that he used a condom during intercourse. Rodriguez stated that he and Baldwin began to fight after having intercourse when she lit a crack pipe and he did not approve. He claimed that Baldwin then tried to attack him with a knife. Rodriguez maintained that he never hit or threw Baldwin against a wall but instead placed her in a choke hold until she lost consciousness. He claimed that the fight happened near the bathroom door and not the bed, where Baldwin's blood was found.

Rodriguez stated that he checked Baldwin for a pulse and found none. He thought it would be futile to try to revive Baldwin with CPR because she had no pulse and also because she had blood on her mouth. He admitted that he purchased the suitcase and that he stuffed Baldwin's body into it; he took the suitcase containing Baldwin's body to a dumpster and threw it in. He stated that he then went back to the Holiday Inn, slept for awhile, and later went to eat. He claimed that the only injuries to Baldwin when he placed her into the suitcase were a bruise to her back and discoloration on her face. Rodriguez kept the knives that Baldwin had in her possession. Rodriguez's attorney turned over the pocket knives to the police, one of which contained Baldwin's fingerprint.

The autopsy findings revealed that Baldwin died from blunt force trauma and asphyxiation. The majority of the approximately fifty blunt force wounds, including abrasions, lacerations, and bruises to her torso, extremities, head and neck, occurred shortly

before or at the time of Baldwin's death. She also suffered contusions, abrasions and hemorrhages to her urethra, anal, and vaginal areas, including injury to her cervix. The bruises on Baldwin's thighs were consistent with someone grabbing her legs and pushing them out. She suffered two black eyes, and there was evidence that her head was struck with or against something. There were no defensive wounds consistent with a knife fight or wounds consistent with her being placed in a choke hold. The wounds on Baldwin's neck were consistent with having been "taken from behind with [the] fingers on the left-hand side [of her neck] and the thumb on the right-hand side." Although the injuries sustained by Baldwin were sufficient to cause her death, the medical examiner could not confirm that Baldwin was dead before being placed in the suitcase. However, he testified that, due to her placement and position in the suitcase, she would have died very shortly thereafter due to "positional asphyxiation." The medical examiner distinguished the pre-death wounds from the post-death injuries that occurred when the suitcase was transported by garbage truck to the landfill.

In point of error six, Rodriguez contends that the evidence is legally insufficient to prove that he intentionally murdered the victim while committing or attempting to commit aggravated sexual assault.[6] First, Rodriguez argues that the sexual contact was consensual. Second, he argues that, even if he did commit aggravated sexual assault, Baldwin died from injuries unrelated to the sexual assault. He notes that the medical examiner testified that he

---

[6] *See* TEX. PENAL CODE § 19.03(a)(2).

could not rule out that Baldwin was still alive when she was placed in the suitcase. Therefore, Rodriguez, argues that "[i]f the death occurred at some time other than during or immediately in the aftermath of the activity in the hotel room, the offense committed was murder, not capital murder."

In reviewing a claim that evidence is legally insufficient to support a judgment, "the relevant question [on appeal] is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."[7] This standard accounts for the factfinder's duty "to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts."[8] Therefore, in analyzing legal sufficiency, we will determine whether the necessary inferences are reasonable based upon the combined and cumulative force of all the evidence, both direct and circumstantial, when viewed in the light most favorable to the verdict.[9]

Rodriguez's first argument is that he did not commit the underlying offense of aggravated sexual assault because the sex was consensual. The offense of aggravated sexual assault requires that the sexual contact be without consent.[10] Although Rodriguez argues that

---

[7] *Jackson v. Virginia*, 443 U.S. 307, 319 (1979).

[8] *Id.*

[9] *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007).

[10] TEX. PENAL CODE § 22.021(a)(1)(A).

Baldwin, a prostitute, willingly went to his hotel room to have sex, the evidence showed extensive damage to Baldwin's vagina, cervix, anus, and the surrounding external areas. Baldwin sustained injuries consistent with her thighs being forced apart. She also sustained several other major blunt force traumas to her breasts and buttocks and was strangled. The medical examiner testified that all these injuries occurred shortly before or at the time of death. Based on this evidence, the jury could reasonably infer that, even if Baldwin willingly went to Rodriguez's hotel room, the sexual encounter, at some point, became non-consensual.

Next, Rodriguez argues that because Baldwin's death could have occurred after he placed her in the suitcase, the evidence is insufficient to show that he intended to murder Baldwin during the course of committing aggravated sexual assault. However, the evidence shows that Baldwin was severely beaten and manually strangled. The medical examiner testified that the blunt force trauma and asphyxiation that occurred before Baldwin was placed in the suitcase were sufficient to cause her death. In his confession, that was admitted into evidence, Rodriguez stated that Baldwin had no pulse before he went out to purchase the suitcase. Therefore, even if the jury believed Baldwin was still alive when Rodriguez put her in the suitcase, the jury could still find that Rodriguez was guilty of committing capital murder.

We have held that "in the course of committing" an offense listed in Penal Code Section 19.03(a)(2), means "conduct occurring in an attempt to commit, during the

commission, or in the immediate flight after the attempt or commission of the offense."[11] As noted above, Rodriguez severely beat and manually strangled Baldwin while in the course of sexually assaulting her. Following this, he claims that he was not positive that Baldwin was dead. But this contention is contradicted by Rodriguez's own confession. Moreover, the evidence shows that Rodriguez felt confident that Baldwin was completely incapacitated when he left his hotel room, drove to Walmart, and calmly purchased a suitcase. Upon returning to his hotel room, Rodriguez stuffed Baldwin into the suitcase and then dropped her in a dumpster. Under Rodriguez's own statement, this final act was certain to cause Baldwin's death. He also made sure that Baldwin's identification and wallet would not be found with her body. "We see no material difference between this [evidence] and the armed bank robber who shoots his victim as he flees, in order to eliminate the only witness to his crime"[12]—both are sufficient to show capital murder.

Viewed in the light most favorable to the prosecution, we find that a rational trier of fact could have found from the evidence beyond a reasonable doubt that Rodriguez intended to murder Baldwin while in the course of committing aggravated sexual assault. We hold that the evidence was legally sufficient to support the jury's verdict.[13] Appellant's sixth point of error is overruled.

---

[11] *Wooldridge v. State*, 653 S.W.2d 811, 816 (Tex. Crim. App. 1983).

[12] *Id.*

[13] *See Jackson*, 443 U.S. at 319.

In Rodriguez's seventh point of error, he argues that the evidence is factually insufficient to prove that he intentionally murdered the victim while committing or attempting to commit aggravated sexual assault. We no longer conduct factual sufficiency reviews.[14] Point of error seven is therefore overruled.

In points of error one and three, Rodriguez asserts that the evidence was not sufficient to show that he intentionally killed a pregnant woman and her unborn child because he did not know that Baldwin was pregnant. Therefore, he argues that he could not be guilty of murdering two persons during the same criminal transaction.[15] In point of error two, Rodriguez argues that the trial judge erred by failing to submit a jury charge requiring that the jury find that Rodriguez specifically intended to kill an unborn child. In points of error four and five, he contends that the evidence is insufficient to support the jury's rejection of his self-defense claim with regard to the charge of intentionally killing more than one person during the same criminal transaction.

This case was prosecuted and tried before our 2008 ruling in *Roberts v. State*. The State concedes that there was no evidence at trial that Rodriguez had any knowledge that Baldwin was pregnant. Baldwin was still in the first trimester of her pregnancy and there were no outward signs that she was pregnant. Therefore, the State agrees that the evidence

---

[14] *Martinez v. State,* 327 S.W.3d 727, 736 (Tex. Crim. App. 2010); *Brooks v. State*, 323 S.W.3d 893, 912 (Tex. Crim. App. 2010) (plurality op.).

[15] *Roberts v. State*, 273 S.W.3d 322, 331 (Tex. Crim. App. 2008) (one who kills a pregnant woman without knowledge of the embryo's existence cannot form specific intent to kill the embryo).

is insufficient to show that Rodriguez intentionally murdered more than one person during the same criminal transaction.

In a capital murder case, when the charge authorizes the jury to convict on more than one theory, a guilty verdict will be upheld if the evidence is sufficient on any one of the theories.[16] In one count, the indictment alleged that Rodriguez: (1) committed murder in the course of committing or attempting to commit aggravated sexual assault, and (2) committed the murder of more than one person during the same criminal transaction. The jury charge authorized a conviction under either theory and, in fact, the trial judge submitted a separate charge for each. The jury found Rodriguez guilty under both theories. Because the evidence is legally sufficient on the theory of murder committed in the course of aggravated sexual assault, we will not address the points attacking the alternatively charged theory of murdering more than one person during the same criminal transaction. Points of error one through five are overruled.

**Punishment Phase**

In point of error twenty-two, Rodriguez challenges the sufficiency of the evidence regarding future dangerousness.[17] In reviewing the sufficiency of the evidence at the punishment phase, we view the evidence in the light most favorable to the verdict and

---

[16] *Martinez v. State*, 129 S.W.3d 101, 106 (Tex. Crim. App. 2004); *see also Rosales v. State*, 4 S.W.3d 228, 231 (Tex. Crim. App. 1999); *Kitchens v. State*, 823 S.W.2d 256, 258 (Tex. Crim. App. 1991).

[17] *See* TEX. CODE CRIM. PROC. art. 37.071 § 2(b)(1).

determine whether any rational trier of fact could make the finding beyond a reasonable doubt.[18]  A jury is permitted to consider a variety of factors when determining whether a defendant will pose a continuing threat to society.[19]  Additionally, the jury is entitled to consider all the evidence presented at the guilt phase of the trial, in addition to the evidence presented at the punishment phase.[20]  The circumstances of the offense and the events surrounding it may alone be sufficient in some instances to sustain a "yes" answer to the future dangerousness special issue.[21]  The jury is the exclusive judge of the credibility of witnesses and the weight to be given their testimony.[22]

The evidence in this case revealed that Rodriguez, after inviting Baldwin to his hotel room, brutally beat, strangled, and raped her before and at the time of her death.  Rodriguez then left his victim, drove to the closest Walmart, and purchased a large suitcase.  Upon returning to his hotel, he stuffed Baldwin's body into the suitcase and then transported it to a dumpster.  He threw Baldwin's purse and identification in a different dumpster to prevent easy identification.  After this, he purchased a large meal, ate it, rented and watched a movie,

---

[18] *Williams v. State,* 273 S.W.3d 200, 213 (Tex. Crim. App. 2008); *Banda v. State*, 890 S.W.2d 42, 50 (Tex. Crim. App. 1994).

[19] *See Keeton v. State*, 724 S.W.2d 58, 61 (Tex. Crim. App. 1987).

[20] *Banda*, 890 S.W.2d at 51; *Valdez v. State*, 776 S.W.2d 162, 166-67 (Tex. Crim. App. 1989).

[21] *Banda,* 890 S.W.2d at 51; *see also Hayes v. State,* 85 S.W.3d 809, 814 (Tex. Crim. App. 2002).

[22] *Colella v. State*, 915 S.W.2d 834, 843-44 (Tex. Crim. App. 1995).

and then slept before checking out of his hotel room. This evidence of such a callous crime could, on its own, support a finding of future dangerousness. However, the State presented additional evidence at the punishment phase that supports the jury's finding.

Rodriguez began dating Julia Ross when she was fifteen years old and they were both in high school. When she was sixteen, the relationship became sexual. Although they did have consensual sex, Rodriguez would get rough with her to the point that her friends stepped in and spoke to Rodriguez about it. He joked with Ross saying, "I'll beat you." She tried to laugh off these events. However, when Ross became uncomfortable during a sexual encounter, she asked him to stop and tried to push him off. Rodriguez did not stop, even though Ross began screaming. He raped her anally and vaginally on more than one occasion. Once when he was angry at Ross, he pushed her across a bed, dragged her from the house to his car, and attempted to force her into it. Ross testified that Rodriguez would "zone out" during sex—he "wouldn't be there anymore." She was scared to break up with him, but they finally went their separate ways after high school.

Imelda Montana met Rodriguez when she pledged Chi Ro, a co-ed Catholic service fraternity, at Texas Tech University during the spring semester in 2004. She got drunk at a Chi Rho party, and Rodriguez volunteered to drive her home. When they got to her dorm room, they began to make out. When things began to go too far, she asked him to stop. Rodriguez proceeded to remove her clothes and "forced himself" on her. She passed out. The next morning, Rodriguez was still there and warned her not to tell anyone or else she

might get kicked out of the fraternity. On another occasion at a small gathering of Chi Rho friends, Rodriguez pushed Montana against a brick wall, holding her hands over her head. He turned her to face the wall and attempted to pull down her pants, but she struggled and managed to get away. She testified that she and Rodriguez had not even been talking to each other before this occurred. She also testified that Rodriguez was drunk at the time.

Jennifer Longmore also met Rodriguez when she pledged Chi Rho in 2004. She was drawn to his magnetic personality, and they went out on a couple of dates and spent time together. He told her to keep their relationship a secret or else she might get kicked out of Chi Rho as actives and pledges were not supposed to date. She testified they had consensual sex, but that sometimes he would become overly forceful and "something would switch in his personality from that fun loving, sweet guy to this scary, controlling kind of evil person." On more than one occasion he forced sex on her, ignoring her refusals to be with him. She was scared to break up with him because he had become "this scary sometimes kind of crazy violent person."

Angelica Gonzales pledged Chi Rho in Spring 2004. She was not dating anyone and had never had sexual relations because she was waiting until marriage. She and Rodriguez began dating, and he even met her parents. Gonzales believed that she was falling in love with him. When she found out that Rodriguez was seeing other girls in Chi Rho, she went to his apartment and confronted him. Rodriguez then told Gonzales that he loved her, that he was a good person, and that they could work things out. When she got up to give him a

hug and leave, he blocked her and sat her down again. When she rebuffed his attempt to kiss her, he advanced on her. Gonzales attempted to push him off saying, "No," but it was "like he flipped into a different mode." He grabbed her hands and held them over her head and then forced her thighs apart. He then sexually assaulted her despite her continued protestations.

Jennifer Milbeck met Rodriguez when he took some "glamour shots" of her at a store at the mall. She had just turned sixteen years old. Rodriguez used the information Milbeck gave at the store during her photo shoot to contact her. He asked if he could come to her home, and she agreed. When Rodriguez arrived, he immediately tried to kiss Milbeck. She moved away and told him, "No, that's not why I thought you were here." He said, "Why would I come here?" Rodriguez then pushed Milbeck down on her bed. She protested, and he told her that he was not going to rape her. He then pushed her legs apart and sexually assaulted her.

Sixteen-year-old Joanna Rogers disappeared on May 4, 2004. During the investigation into her disappearance, it was discovered that Rodriguez had been in Rogers's internet "chat room" and had called Rogers's personal home phone several times in April and May 2004. At 3:13 a.m. on the morning she disappeared, Rodriguez called Rogers's personal home phone line, and a ten-minute conversation occurred. Twenty minutes later, Rodriguez called Rogers again, and a one-minute conversation occurred. Rodriguez lived approximately twenty minutes from Rogers's home. Rogers's father heard a noise at 3:30

a.m. on May 4, 2004, but when he looked outside, he did not see anything and assumed that the dogs had just knocked over the trash can. Rogers was missing the next morning. During a search of Rodriguez's computer, it was discovered that he ran several internet searches on Rogers after her disappearance—these searches were conducted simultaneously with his internet searches concerning the discovery of Baldwin's body.

Rodriguez presented evidence that he grew up in a household with an alcoholic father who abused his mother and, on some occasions, his sisters. Rodriguez witnessed the abuse and heard his father regularly berate women. Rodriguez's father also pressured him to succeed—his father did not accept failure. Despite this, relatives and family friends all testified that Rodriguez was a friendly, respectful, courteous, and well-behaved child. Rodriguez's aunt believed that he was highly intelligent, had great potential, and she had hoped that he would one day become the first Hispanic President of the United States. Rodriguez also highlighted his good behavior in jail and his respect of the detention officers for over two years while awaiting his trial.

Rodriguez now argues that his mitigating evidence, that Baldwin's murder was not premeditated, and that he had little prior criminal history, should outweigh the evidence presented by the State. However, we have held that, while this Court can review the objective evidence of future dangerousness, we do not engage in reviewing the jury's

normative decision on mitigation, whether it answers in the affirmative or the negative.[23]

Nor do we weigh the aggravating versus mitigating factors under future dangerousness.[24]

Therefore, we defer to the jury's conclusion that the mitigating evidence was not sufficient

to warrant a sentence of life imprisonment.

Given the facts of this offense, evidence of Rodriguez's violent nature, and his past

acts of sexual assault, we conclude that a rational jury could find that there is a probability

Rodriguez would commit criminal acts of violence that would constitute a continuing threat

to society. Point of error twenty-two is overruled.

In points of error twenty-four and twenty-five, Rodriguez contends that the sentencing

phase was rendered completely unreliable because jurors were able to consider that they had

found him guilty of killing two persons during the same criminal transaction[25]—the killing

of both Baldwin and her unborn child. Rodriguez concedes that the jury also found him

guilty of murder during the course of committing or attempting to commit aggravated sexual

assault. However, because we later determined in *Roberts* that a defendant cannot be

convicted of murdering an unborn child if the defendant was unaware of the child's

existence,[26] Rodriguez argues that the jury's consideration of the unborn child's death so

---

[23] *Colella*, 915 S.W.2d at 845.

[24] *McFarland v. State*, 928 S.W.2d 482, 497-98 (Tex. Crim. App. 1996).

[25] TEX. PENAL CODE § 19.03(a)(7)(A).

[26] *Roberts*, 273 S.W.3d at 331.

infected the sentencing phase as to deny him his due process rights.

Even if we assumed that our ruling in *Roberts* somehow created *ex post facto* constitutional error during the punishment phase, that error is subject to a harm analysis under Texas Rule of Appellate Procedure 44.2(a). Rule 44.2(a) provides that constitutional error requires reversal of the judgment "unless the court determines beyond a reasonable doubt that the error did not contribute to the conviction or punishment." We review the record as a whole when conducting this harm analysis.[27]

The record shows that during the punishment phase, the jury was not presented with any evidence that Rodriguez was a danger to unborn children. In fact, at the guilt phase, the jury was told that Rodriguez did not know that Baldwin was pregnant and that Baldwin showed no outward signs that she was pregnant. It was explained to the jury that they had to use "transferred intent" to even find Rodriguez guilty of killing two people during the same criminal transaction. On the other hand, at punishment, the jury heard extensive evidence about how Rodriguez preyed on young women and sexually assaulted them. The State's closing argument at punishment focused on Rodriguez's threat to women and his skillful ability to manipulate people—the State did not discuss the killing of the unborn child nor was it brought up by the defense.

We are persuaded, beyond a reasonable doubt, that the jury's verdict as to punishment would have been the same even if the jury had not convicted Rodriguez of killing the unborn

---

[27] *Clay v. State,* 240 S.W.3d 895, 904 (Tex. Crim. App. 2007).

child.  The jury had also convicted Rodriguez of murdering Baldwin during the course of committing aggravated sexual assault.  That Baldwin's ten-week-old fetus was killed during the murder and sexual assault added little, if anything, to the large amount of negative evidence presented at punishment.  Points of error twenty-four and twenty-five are overruled.

In points of error thirty-two through thirty-four, Rodriguez urges this Court to conduct a sufficiency review of the mitigation special issue and asserts that the failure to do so violates his Eighth Amendment rights.  Again, we do not review the sufficiency of the evidence to support a jury's negative answer to the mitigation special issue.[28]  We have rejected the claim that this deprives a defendant of "meaningful appellate review."[29]  We have also rejected the claim that the mitigation special issue violates the Eighth Amendment on the ground that meaningful appellate review of the jury's determination is impossible.[30]  Rodriguez does not persuade us to revisit these holdings.  Points of error thirty-two through thirty-four are overruled.

### Lesser-Included Offenses

In points of error eight and nine, Rodriguez argues that the trial judge erred in denying his request to instruct the jury on the lesser-included offenses of manslaughter and criminally

---

[28]  *Russeau v. State*, 171 S.W.3d 871, 886 (Tex. Crim. App. 2005); *McGinn v. State*, 961 S.W.2d 161, 166 (Tex. Crim. App. 1998).

[29]  *Green v. State*, 934 S.W.2d 92, 106-07 (Tex. Crim. App. 1996); *McFarland*, 928 S.W.2d at 498-99.

[30]  *Prystash v. State*, 3 S.W.3d 522, 535-36 (Tex. Crim. App. 1999).

negligent homicide. Specifically, he argues that, because the medical examiner testified that he could not rule out that Baldwin was still alive when she was put in the suitcase, there was evidence that Rodriguez was only reckless or negligent in causing her death. Rodriguez did receive an instruction for the lesser-included offense of murder.

In determining whether Rodriguez is entitled to a charge on a lesser-included offense, we must consider all of the evidence introduced at trial, whether produced by the State or the defendant.[31] We use a two-pronged test in our review.[32] First, the lesser-included offense must be included within the proof necessary to establish the offense charged.[33] Second, there must be some evidence in the record that if the defendant is guilty, he is guilty only of the lesser-included offense.[34] The credibility of the evidence and whether it conflicts with other evidence or is controverted may not be considered in determining whether an instruction on a lesser-included offense should be given.[35]

This Court has long held that both manslaughter and criminally negligent homicide

---

[31] *Goodwin v. State*, 799 S.W.2d 719, 740 (Tex. Crim. App. 1990).

[32] *Rousseau v. State*, 855 S.W.2d 666, 672-75 (Tex. Crim. App. 1993); *Goodwin*, 799 S.W.2d at 740-41.

[33] *Rousseau*, 855 S.W.2d at 672-75.

[34] *Id.*

[35] *Banda*, 890 S.W.2d at 60.

are lesser-included offenses of capital murder.[36] Therefore, Rodriguez has met the first prong of the test. However, he fails to meet the second prong. Rodriguez's argument is that he was merely reckless or negligent in causing Baldwin's death because he thought that she was only unconscious when he placed her in the suitcase. But this is not evidence that he did not intend Baldwin's death. The evidence shows that Baldwin received approximately fifty blunt force wounds at or before the time of her death, that Rodriguez manually strangled her, and that these injuries were sufficient to cause her death. The evidence shows that Rodriguez checked Baldwin's pulse and found none. Rodriguez then intentionally left the hotel room, purchased a suitcase, returned to the hotel, and stuffed Baldwin's body into the suitcase. Rodriguez then transported Baldwin to a dumpster and intentionally disposed of her personal identification and belongings at another location so that she would be difficult to identify.

Given these facts, we conclude that there is no evidence in the record from which a rational trier of fact could determine that appellant was guilty only of manslaughter or criminally negligent homicide. Even if the jury were to believe Rodriguez's argument that he thought Baldwin might still be alive when he placed her in the suitcase, it does not negate the physical evidence showing his intent to kill.[37] The trial judge did not err in refusing the instructions. Points of error eight and nine are overruled.

**Voir Dire**

---

[36] *Cardenas v. State*, 30 S.W.2d 384, 392 (Tex. Crim. App. 2000).

[37] *See Tompkins v. State*, 774 S.W.2d 195, 210-12 (Tex. Crim. App. 1987).

**Improper Questions**

In points of error ten through thirteen, Rodriguez asserts that the trial judge denied him his constitutional right to a jury trial under the Eighth and Fourteenth Amendments and the Texas Constitution, Article I, Sections 10, 13, and 19, when the trial judge restricted his questioning during voir dire. Specifically, in points ten and eleven, he argues that the trial judge erred in preventing him from presenting hypothetical questions that asked whether prospective jurors Joseph Davidson, Kim Drake, and Richard Constancio would consider mitigating evidence if a victim was an unborn child. In points twelve and thirteen, he contends that the trial judge erred in refusing to let him ask "proper mitigation commitment questions."

Part of the constitutional guarantee of the right to an impartial jury is an adequate voir dire to identify unqualified jurors.[38] "Without an adequate voir dire the trial judge's responsibility to remove prospective jurors who will not be able impartially to follow the court's instructions and evaluate the evidence cannot be fulfilled."[39] "The Sixth Amendment guarantee to trial by an impartial jury includes the right to have jurors that can follow the law and consider the evidence. In other words, the jury must be able to make an independent determination based on the facts presented at trial, not on any personal opinions they may

---

[38] *Morgan v. Illinois,* 504 U.S. 719, 729 (1992).

[39] *Id.* at 729-30.

have."[40] The United States Supreme Court has held that peremptory challenges are not required by the United States Constitution, and so the fact that a proffered question would prompt "a revelation [that] would be of some use in exercising peremptory challenges" does not mean that such a question is compelled by the federal constitution, so long as the failure to ask it does not render the trial fundamentally unfair.[41]

The record in this case reveals that prospective jurors were told that Rodriguez was charged with intentional murder while committing or attempting to commit sexual assault, and the intentional murder of more than one person: Baldwin and an unnamed child that was in utero. During defense counsel's questioning on the subject of the mitigation special issue, counsel asked Davidson to assume, for the purpose of voir dire, that the defendant committed an intentional capital murder, that it was not self-defense or the defense of property, that he was not insane or intoxicated, and that the jury had determined that he would be a future danger. In pertinent part, the following colloquy occurred:

[Defense]: Okay. Then it is fair for me to say, or fair for me to believe that what you're telling me is that even assuming horrible facts, a horrible murder, that there might be circumstances that surrounded where the person committed that murder was in their life at that time, that you might could see justifying you finding a life sentence?

A. Yes, sir.

Q. Okay. Would it be hard for you to justify in your mind going for

---

[40] *Raby v. State,* 970 S.W.2d 1, 10 (Tex. Crim. App. 1998).

[41] *Mu'Min v. Virginia,* 500 U.S. 415, 425 (1991).

a life sentence under circumstances like that?

A.        No, sir.

* * *

[Defense]:    You were told by [the prosecutor] that the allegations in this case are that one of the victims was in utero, an unborn child. If you sat on this case, and I'm not talking so much about this case. But if you sat on a case where those were the facts, would you be able to consider mitigating evidence –

[State]:    Judge, I'm going to object as he's asking specifically about the facts and asking him to commit one way or another to the specific set of facts of this case, and that's improper.

[Defense]:    Your Honor, we have to find out if he can consider – reasonably consider these issues.

[COURT]:    I'll allow you to ask the question.

* * *

[Defense]:    If you sat in a capital murder case and a victim was an unborn child, you found that person guilty, would you be able to consider mitigating evidence? The character of the convicted, any evidence along those lines to consider a life sentence?

[State]:    Judge may we approach outside the presence of the venireman?

* * *

Your Honor, again, we're going to specifically object to that question. That is clearly getting this juror to commit to a specific set of facts on whether or not he can consider mitigation evidence.

[COURT]:    I don't think that's a specific commitment question. I think –

[State]: On a case involving a child in utero, can you – will you consider mitigating facts? That's exactly what a commitment question is. He's given on a type – a specific type of case, can you consider mitigation evidence? That's exactly what a commitment question is.

* * *

[Defense]: Your honor, we're asking him if he can follow the law and that's all – if he can follow the law in this case, and we're certainly entitled to do that.

[State]: The law is, will you consider mitigation evidence in a capital murder case, not on a specific set of facts.

* * *

That is what he is doing, your Honor. I mean, he's committing him to this case, whether or not he will consider mitigation evidence in this case. That's exactly what he is doing.

[Defense]: The Court is aware of cases where the opinion of the Appeals Court is that you have to ask that question to see if they're qualified to serve in this case. Because if he's not able to consider mitigation because of – one of the victims was in utero, then he's not qualified under the law. And he's subject to a challenge for cause. And there's no way for us to know that without asking the question.

[COURT]: Well I can see where [the prosecutor] is coming from.

[State]: We obviously know he has to be – make an informed decision whether or not he can – will consider mitigation evidence. But –

[COURT]: The Court will order that you ask – if you are going to ask a question such as that, that you not relate anything concerning the facts of this case in any way.

[Defense]: May it please the Court, I didn't do anything more than what

[the prosecutor] did by explaining the indictment.

[COURT]: But he didn't go into whether or not that would affect his decision with regard to what punishment he might assess.

[Defense]: So – and I'm happy to do what the Court wants. I want to be sure, though, I'm just not to say that this case alleges the death of a –

[COURT]: Can he imagine a set of circumstances where he could or could not determine or assess a life sentence in a capital murder case involving two persons?

[Defense]: Where one of the persons was pregnant?

[COURT]: No. We're not going to ask anything about that.

[Defense]: Well, then, I'm not being permitted to ask a question that would qualify for a challenge for cause, because if he can't consider it when one of the victims is in utero, then he's subject to a challenge for cause.

[State]: That's like saying, if I give you a set of – specific set of fact patterns, could you consider probation in a murder case? And if nobody could consider probation in a murder case, then it's the same thing. But that's not what the law requires. What the law requires is, can you consider a set of circumstances where you can answer those questions in such a way that a life sentence is imposed, not if I give the facts of this case to each juror.

[COURT]: I'm going to sustain [the State's] objection as far as what you just said.

* * *

[Defense]: All right. Now, so I don't run afoul of the Court's ruling, I'm just not to talk about the age of the victim?

[COURT]: Yes.

* * *

> Can you consider mitigating evidence involving the death of two
> or more persons?  And if one of those persons was a child?

When defense counsel resumed questioning Davidson, Davidson continued to state that he would consider mitigating circumstances in any capital murder case even though the jury answered the future dangerousness issue affirmatively.

We have held that "[c]ommitment questions are those that commit a prospective juror to resolve, or to refrain from resolving, an issue a certain way after learning a particular fact."[42]  A question may be proper if it seeks to discover a juror's views on an issue applicable to the case, including the subject of mitigating evidence.[43]  An otherwise proper question is impermissible, however, if it attempts to commit the juror to a particular verdict based on particular facts.[44]

Here, the defense attempted to commit Davidson to a decision regarding mitigating evidence based upon a specific fact of this case—that a victim was in utero.  This question is no different than asking a juror, "Could you consider probation in a case where the victim is a nun?"  We have held such queries to be improper commitment questions.[45]  The trial

---

[42]  *Standefer v. State*, 59 S.W.3d 177, 179 (Tex. Crim. App. 2001).

[43]  *Goff v. State*, 931 S.W.2d 537, 546 (Tex. Crim. App. 1996).

[44]  *Standefer v. State*, 59 S.W.3d at 181.

[45]  *Wingo v. State,* 189 S.W.3d 270, 271 (Tex. Crim. App. 2006); *Standefer*, 59

(continued...)

judge did not err in disallowing the question. Points of error ten and eleven are overruled.

In points of error twelve and thirteen, Rodriguez argues that the trial judge erred when he held, during more than one hearing outside the presence of the venire, that he could not ask every prospective juror the following questions:

- Would it affect the juror's ability to consider mitigating circumstances if the victim were a five gram fetus?

- Would it affect the juror's ability to consider mitigating circumstances if the fetus were killed during a rape?

- Would it affect the juror's ability to consider mitigating circumstances if the victim were severely beaten?

- Would it affect the juror's ability to consider mitigating circumstances if the body of the victim was placed in a suitcase and discovered at the Lubbock landfill?

- Would it affect the juror's ability to consider mitigating circumstances if the victim was a prostitute and addicted to drugs?

- Would the juror consider the fact that the defendant was raised in an abusive/violent home to be a mitigating circumstance?

- Would the juror consider the fact that the defendant was raised by a mentally-ill father to be a mitigating circumstance?

- Would the juror consider the fact that the defendant had been a good father and husband to be a mitigating circumstance?

- Would the juror consider whether the defendant is capable of living or being confined for the rest of his life without incident to be a mitigating circumstance?

---

[45](...continued)
S.W.3d at 183 n.28.

- Would the juror consider the fact that the defendant had not had disciplinary problems while awaiting trial to be a mitigating circumstance?

- Would the juror consider the fact that the defendant had been a good employee in the past to be a mitigating circumstance?

- Would the juror consider the fact that the defendant was a loving son and brother to be a mitigating circumstance?

Rodriguez recognizes that this Court held in *Joubert v. State*:

A venireperson is not challengeable for cause on the ground that she does not consider a particular type of evidence to be mitigating. Indeed, a party is not entitled to question a venireperson as to whether the venireperson could consider particular types of evidence to be mitigating.[46]

Rodriguez provides us with no new argument that persuades us to reconsider our holdings. The trial judge did not err in restricting the defense's voir dire questions attempting to commit jurors regarding mitigating evidence and the specific facts of this case. Points of error twelve and thirteen are overruled.

### Challenges for Cause

In points of error fourteen through twenty-one, Rodriguez asserts that the trial judge erred in denying his challenges for cause against venirepersons Lisa Arnn, Joy Desha, James Newton, Glenda Uselton, David Stewart, and Patricia Cook. Rodriguez challenged the six venirepersons for cause because they allegedly were unable to follow the law applicable to

---

[46] 235 S.W.3d 729, 734 (Tex. Crim. App. 2007); *see also Standefer*, 59 S.W.3d at 181-82; *Rosales v. State*, 4 S.W.3d 228, 233 (Tex. Crim. App. 1999); *Raby v. State*, 970 S.W.2d 1, 3 (Tex. Crim. App. 1998).

the case.[47]

Rodriguez exercised peremptory strikes on each of the complained-of venirepersons because his challenges for cause were denied. As noted previously, he exhausted all his peremptory challenges and was granted three additional peremptory strikes.[48] After the trial judge denied his request for any additional peremptory strikes, Rodriguez was forced to accept an objectionable juror whom he identified. Error, if any, is preserved. However, because the trial judge granted Rodriguez three additional peremptory strikes, we will not reverse his conviction unless he demonstrates that the trial judge committed error in denying his challenges to at least four of the complained-of venirepersons.[49]

Because the trial judge is in the best position to evaluate each venireperson's demeanor and responses, we review a trial judge's ruling on a challenge for cause with considerable deference.[50] When the potential juror's answers are vacillating, unclear, or contradictory, particular deference is accorded to the trial judge's decision.[51] We will reverse

---

[47] *See* TEX. CODE CRIM. PROC. art. 35.16 (c)(2).

[48] *See* TEX. CODE CRIM. PROC. art. 35.15 (a).

[49] *See Escamilla v. State*, 143 S.W.3d 814, 821 (Tex. Crim. App. 2004); *Martinez v. State*, 763 S.W.2d 413, 425 (Tex. Crim. App. 1988).

[50] *See Wainwright v. Witt*, 469 U.S. 412, 429 (1985); *Guzman v. State*, 955 S.W.2d 85, 89 (Tex. Crim. App. 1997).

[51] *Colburn v. State*, 966 S.W.2d 511, 517 (Tex. Crim. App. 1998).

a trial judge's ruling on a challenge for cause "only if a clear abuse of discretion is evident."[52]

In his fourteenth and nineteenth points of error, Rodriguez argues that the trial judge erred by denying his challenge for cause to venireman Arnn. Specifically, in point of error fourteen, he alleges Arnn was a "burden shifter" on the future dangerousness issue. He claims that she indicated an understanding of the burden of proof, but still expected the defense to produce evidence to support a finding of "no" to the question:

> [Defense]: And so now you're turning to the first – now we go into punishment, and you're consider [sic] the first special issue, the future dangerousness special issue. Would you expect or would you require the Defense to bring in evidence to persuade you that he wasn't going to be a danger in the future?
>
> A. Yes.
>
> [Defense]: Okay. And you understood when [the prosecutor] talked to you about burdens of proof; is that right?
>
> A. Yes.
>
>                     \* \* \*
>
> [Defense]: Okay. So bottom line is before you would consider voting no on that first question, the Defense would be – would have to bring you some evidence as to why you should vote no; is that correct?
>
> A. Yes.

On redirect, after the State explained the law to Arnn, she responded in the negative when the State asked her if she was "going to make the Defendant put on evidence that shows he's not a future danger in any way":

---

[52] *Id.*

[State]:     Okay. And you understand – and, again, now let me tell you what the law is. [Defense counsel] didn't tell you what the law was as far as the Defendant's – what he has to do, and what he doesn't have to do regarding that Special Issue No. 1. The Defendant doesn't have to put on any evidence to show he was a – there was mitigating factors, okay? You may hear evidence in the guilt innocence phase through a witness that they put on, or a witness that I put on, because they don't have to do anything. That you say, "Well, there is some history of child abuse in his background," you can consider that in lessening the punishment if you feel that's appropriate.

A.           Yes.

[State]:     Okay? He doesn't have to prove – he doesn't have any burden of proof. He doesn't have to prove that he didn't do it, and he doesn't have to prove that there's mitigating circumstances. Now, the flip side of that is if you don't hear anything, "[sic] Well, you don't have to vote in that way. But, again, my point to you is only this. The law says that – remember, it's kind of that deal about our children. We like to hear both sides of the story, but most of the time you're not going to. And the law says you can't use that against him in any way what so ever, okay? Are you telling us that you would? Would you use that against him in any way?

A.           The not –

[State]:     If he chose not to put on any evidence or remain silent.

A.           No.

[State]:     Okay. And you understand that you could answer that question no simply because I didn't prove it? I may not be able to prove that a Defendant was a future danger. And if I don't, the answer is no and it's a life sentence, okay? Hold my feet to the fire. If I don't prove it, then it's not – then the answer is no. If I don't prove the case, the answer is not guilty, okay? Do you see kind of now how the law works in that regard?

A.      Yes.

* * *

[State]:      Are you going to make the Defendant prove his innocence in any way?

A.      No.

[State]:      Are you going to make the Defendant put on evidence that shows he's not a future danger?

A.      No.

[State]:      Would you just look at the evidence that is presented and answer those questions based on that and that alone?

A.      Yes.

However, upon further questioning by defense counsel, Arnn again became confused by the questioning:

[Defense]:      So you're trying to decide at this point, and you've heard the evidence, you're trying to decide at this point whether the person on trial is probably going to commit future acts of criminal violence, okay? And I understood you before, you'd say in order to find a no answer to that, you would expect – you would require the Defendant to bring evidence to that effect?

A.      Evidence that they are not a future danger?

[Defense]:      Yes, ma'am.

A.      No.

[Defense]:      Okay. Tell me what – tell me what you mean.

A.      Evidence that they're not, I think would be – I don't know how you can prove that somebody is not. Maybe you can prove that they are. I don't

know what kind of evidence other than maybe somebody's personal background.

\* \* \*

[Defense]: But in a case where you had found the Defendant guilty of capital murder, having determined that he intentionally and knowingly committed the offense, that he wasn't defending himself or others, that he was sane and all those things, that the victim wasn't – didn't cause it okay? I'd understood before that you would require evidence from the accused to show – to persuade you that he wasn't going to be probably committing criminal acts of violence in the future. Did I understand you right?

A. Would I require proof or evidence from the Defense that he was not a danger to society?

[Defense]: Right.

A. Yeah, I would have to see proof of that.

[Defense]: Okay. And you would need to see proof of that from the Defense?

A. Who else would I see –

[Defense]: Obviously the State's not going to –

A. Who else would I get it from?

[Defense]: So what you are telling us now is that you understand the special issue, and you know that –

A. Uh huh.

[State]: Your Honor, I'm going to object to this line of questioning. Again, [defense counsel] has not explained the law to her that's required to make sure that she understands what the law is in that regard. He has not explained it to her.

[COURT]:    I think, Ms. Arnn, what you need to be aware of is that when they're talking to you about these special issues as to No. 1 concerning future dangerousness, it's the – the burden of proof is on the State to prove that to your satisfaction.

A.    Okay.

[COURT]:    It's never on the Defense to have to prove that to you. And you would be instructed about that, that it would be the State's responsibility to prove that to you beyond a reasonable doubt. Do you understand that?

A.    Yes, sir.

* * *

[Defense]:    Sure. If you sat on a capital murder jury, and your jury found the person guilty of capital murder, would you require – you personally, this is your moral decision, would you require the Defense to bring in evidence that he wasn't going to commit criminal acts of violence in the future in order to find no to that first special issue?

A.    Whoever brought the evidence to me, I think I'd have to have some type of evidence that yes, he was going to be a future threat. Whether that comes from the Defense or the State, I'd have to get evidence from one place.

[Defense]:    Okay. You brought out what [the prosecutor] talked about a little bit about aggravating evidence, or evidence that tends to prove that. What I'm asking is about evidence you would require in order to find no. I mean, obviously if you were persuaded that the evidence showed he was, you'd answer yes, right?

A.    Yes.

[Defense]:    The flip side of that, then, is would you require evidence from the Defense in order to vote no?

A.        No.

Though Arnn admitted to initially being confused about the burden of proof regarding the future dangerousness question, she later demonstrated she was capable of following the law. At worst, she was a vacillating juror. Therefore, we defer to the trial judge, who can best determine, based upon the prospective juror's tone and tenor, whether that person could follow the applicable law despite his views about the death penalty.[53] Point of error fourteen is therefore overruled.

Concerning point of error nineteen, Rodriguez claims the trial judge erred in denying his challenge for cause to Arnn as being "mitigation impaired." He alleges Arnn did not assure the judge that she could consider mitigation when answering the second special issue. The following exchanges occurred during Arnn's voir dire:

> [Defense]:    And I guess what I'm asking there is, is there anything that would – any type of evidence – and I'm not asking what you consider. I'm not asking you to say, "Well, gosh if you brought me this, this is how I would vote." Is there any type of evidence that you could consider that you think would justify a life sentence instead?
>
> A.    I still go back to thinking very strongly that if they're guilty of murder and they're a threat to society, that no they shouldn't — they should have the death penalty.

* * *

---

[53] *Segundo v. State*, 270 S.W.3d 79, 94 (Tex. Crim. App. 2008); *Feldman v. State*, 71 S.W.3d 738, 749 (Tex. Crim. App. 2002).

[State]:    Number one, let me tell you this. It is totally permissible for you to say, "You know what, if I hear evidence of what they're talking about, and I found somebody guilty of capital murder" – you're assuming a lot of things. You heard a lot of evidence by then. And you hear more evidence that they're a future danger, it's okay to lean towards the death penalty. What you cannot do to be a fair juror is say, "Look, I've already made up my mind. If I think they're guilty of capital murder, and there's a probability that they've committed criminal acts of violence in the future, then I'm not even going to listen to anything else that's said. You can bring in a million mitigating factors in here, whatever they are, I'm not going to listen to them. I'm always going to vote for the death penalty, always." Is that what you were telling [defense counsel]?

A.    I think what I'm trying to say is those two things are very important to me.

\* \* \*

[State]:    Okay. Are you automatically going to vote for the death penalty and not listen to any mitigation evidence from then on out?

A.    What mitigating evidence could there be?

[State]:    Well, it's improper for me to tell you what kind it would be. But here's what – you remember that kind of as we walked through this process. Remember we started off saying there's no good capital murder, right? Can you think of one?

A.    No.

\* \* \*

[State]:    And so what I – I thought I heard you – and that's the reason – that's the reason we have to explain the law to you, okay? Because I can – I've been doing this a long time, so has [defense counsel]. I can get you – if phrase it right, I can get you to pretty much say anything I want, okay? And so it's important for me to make sure that you understand the law. And the law

says, even after both of those things happen, somebody is guilty of capital murder, you found beyond a reasonable doubt that they're going to be a future danger, there may be sufficient mitigating circumstance or circumstances to warrant a life sentence rather than a death penalty. And those mitigating circumstances can be a million things. That drug addiction, alcohol addiction, child abuse, horrible home, and a million other things.

\* \* \*

Okay. Let me ask you this question. If you found somebody guilty of capital murder, and you thought they were a future danger, are you just shutting down then? Are you going to listen to all the evidence and make the decision, or what are you going to do?

A. No. And I – I think I had not taken into consideration that some – that – the possibility of having drug or alcohol – I could not think of any of those circumstances in my head at the time.

\* \* \*

[State]: And can you conceive of circumstances in your mind where somebody may be guilty of capital murder, they may be a future danger, but then you hear evidence that says, "You know what, that was a horrible crime. Guy's going to be a future danger, but I've heard evidence that was sufficient mitigating evidence that said I need to give a life sentence. That's what the evidence demands I do." Can you conceive of circumstances like that?

A. I mean, the way you put it makes me – is a little clearer to me, because I think if – you know, if somebody is – is abused as a child growing up, that it could lead to, you know, the kind individual that they are.

[State]: Might explain it, might lessen what you think somebody should be punished by?

A. Exactly.

* * *

[Defense]: Now, what I heard you tell me is that you believe at that point [guilty of capital murder and is a future danger] that death was the appropriate sentence?

A. That's – yes, that's what I told you.

[Defense]: Okay. Is that the way you feel?

A. Whenever [the prosecutor] cleared it up a little bit more, taking into consideration the fact that they could have been abused, or they could have had drug or alcohol abuse, or there's something else that could have stemmed this type of behavior, I turned back on that answer and no, based on that – some other circumstances, no, I can't say a hundred percent that I would always say death penalty.

[Defense]: Okay. So you're saying that if there were some mitigation evidence offered then you might be able to consider –

A. I might be able to consider, yes.

Although Arnn initially stated that she could not consider mitigating evidence, once the law was fully explained to her, she repeatedly stated that she could. The trial judge did not err in denying Rodriguez's challenge for cause against Arnn. Point of error nineteen is overruled.

In Rodriguez's fifteenth and sixteenth points of error, he argues that the trial judge erred when he denied Rodriguez's challenge for cause against prospective jurors Desha and Newton. Rodriguez claims that both jurors indicated an understanding of the burden of proof on future dangerousness, but expected the defense to produce evidence to support a finding

of "no" to the question.

During Desha's voir dire, the following occurred:

[Defense]: But we don't have to do anything. The burden is upon the State to show that probability of future danger, okay?

A. Yes, sir.

[Defense]: My question to you is this, all right? In order for you to be able to find, "No," on that first special issue –

A. Okay.

[Defense]: – in other words no probability of being a future danger, would you require some evidence to show you that in fact a Defendant would not be a future danger?

A. For me I – yes.

\* \* \*

[Defense]: Okay. And you also understand that the burden is on the State to prove that to you beyond a reasonable doubt?

A. Yes, sir.

[Defense]: And my question to you was in order for you to ever be able to answer this, "No," would you require evidence to be shown to you that would show he would not be a future danger?

A. Yes, sir.

Upon further questioning by the State, the following occurred:

[State]: And it may be semantics or how the questions were put. But as you recall when we talked about this Special Issue No. 1.

A. Yes, sir.

[State]: You told me you wouldn't require any evidence to be put on by the Defendant at any time.

A. Yes, sir.

[State]: Is that correct?

A. Yes, sir.

[State]: Is that still true?

A. I'm getting real confused –

* * *

[State]: But I think what the question should have said in my opinion at that point should have said, would you require evidence to show – would you require evidence put on by the Defendant, whether he took the stand or he put on evidence, would you require him to put on evidence, not just evidence, but him to put on evidence showing he's not a future danger?

A. Yes, sir.

[State]: You would require him to put on evidence?

A. Yes, sir.

[State]: Even though that's not the law? That's what I think people a lot of times get confused in. We're not talking about Special Issue No. 2, the mitigating circumstance, where the Defendant can put on theirs.

A. Yes, sir.

[State]: We're talking about this is the job right here to show you as the prosecutor to show you he would be a future danger.

A. Yes, sir.

[State]:  Not anybody else's. The Defendant can sit over there, just like guilt-innocence. He can sit over there and play tiddledywinks and not say anything.

A.  Yes, sir.

[State]:  But if you're going to require him to put on evidence disproving this, then you can't be a fair and impartial juror.

A.  Yes, sir.

[State]:  Is that how you feel? You're hesitating there. That's what we got to know. If you're going to require him to put on evidence, and make him have some kind of burden he doesn't have, then you can't be a fair and impartial juror. Because that's not what the law is.

A.  I think I'm hesitating on that because I'm still not just real sure, are you saying that they do not have to put on any evidence that he would be a future problem to society? Is that what you're telling me?

* * *

[COURT]:  I need you to understand, ma'am, that when he's talking about the burden of proof, he's talking about the burden of proof as to that special issue, not the burden of proof on proving the Defendant guilty beyond a reasonable doubt. When you get to that Special Issue No. 1, you've already gone beyond the person being found guilty.

[Desha]:  Yes, sir.

[COURT]:  The burden of proof is not on the Defense. The burden of proof – I mean, the defense does not have to put any evidence on as to that special issue.

[Desha]:  Yes, sir.

[COURT]: But you and the other jurors have to conclude in your mind that either through evidence presented in the guilt-innocence phase of trial, or the guilt-innocence phase of the trial plus punishment evidence, that the prosecution has proven that special issue to you beyond a reasonable doubt.

[Desha]: Yes, sir.

[COURT]: Is that clear as mud?

[Desha]: Yes, sir, it is.

[State]: But as Defense counsel told you, if you're going to want to hear evidence from the Defendant, if you're going to require evidence from the Defendant, that's okay, that's your personal conviction.

A. Yes, sir.

[State]: But that's not what the law says. And I want to make sure that you understand that, because I thought you understood me when we talked about it the first time.

A. On that, yes, sir.

* * *

[State]: So the question is, I think we all want to know the answer, Ms. Desha, is are you going to require the defendant to put on evidence?

A. No, sir.

[State]: Are you going to require the Defendant to put on evidence to show that he's not a future danger?

A. No, sir.

[State]: Will you hold the prosecutor to their burden, which is beyond a reasonable doubt, hold us to our burden, and not shift that

burden over to them at any time?

A.          Yes, sir.

Like Arnn, Desha was a vacillating juror. Once the law was explained, Desha affirmed she could follow the law. Therefore, the trial judge did not abuse his discretion by denying the defense's challenge for cause. Point of error fifteen is overruled.

The following transpired during Newton's voir dire:

[Defense]:    There's two ways the State cannot meet its burden. One is if the Defense doesn't put on any evidence, but the State cannot meet its burden, right?

A.          Right.

[Defense]:    The other way would be that the State does put on evidence, but so does the Defense.

A.          Uh-huh.

[Defense]:    And then the State doesn't meet its burden because of the Defense evidence?

A.          Right.

[Defense]:    Do you see what I'm saying?

A.          Yes.

[Defense]:    Okay. Now, here's my question. If the Defense were not to put on any evidence, all right?

A.          Okay.

[Defense]:    Based upon – and [the prosecutor] told you that based upon the circumstances of the offense, you know, a brutal violent capital murder.

A.          Uh-huh.

[Defense]:  That you could use that alone to find probability of future danger.

A.          Okay.

[Defense]:  Okay?  Would you ever be able to answer this question, "No", without hearing something from the Defense to show you that in fact this person would probably not be a future danger?

A.          I would I would –  okay.  If the State –  and my answer was, "Yes", for me to go the no, then the Defense would have to show me something –

[Defense]:  That's what I'm asking you.

A.          Yeah.

[Defense]:  And what's your answer?

A.          The State would have to prove something for me to change my answer.

* * *

[Defense]:  Assuming that the Defense does not put on any evidence regarding this special issue, okay?

* * *

Is your answer going to be yes, just based upon the fact that it was a brutal violent capital murder?

A.          Yes.

[Defense]:  Okay.  And so if just based upon the very facts of the case we're sitting on, right?

A.          Right.

[Defense]: In order for you to be able to say, "No, there's no probability of future danger," you would have to hear some evidence from the Defense in order to show you that?

A. Yes.

[Defense]: Is that right?

A. That's right.

[Defense]: Okay. Are you confused about that at all?

A. No, no, no.

However, the following occurred upon questioning by the State:

[State]: Mr. Newton, I think it's just about every other juror I have to come back up here, because I think I get confused – maybe I'm the one confused here. If it's not you, I want to find out, I want to know. But I'd like to think, based on your answers you gave me earlier, that you just were confused when [defense counsel] was asking you some questions. Because I thought when you and I talked, you said that you understood that the law was that the burden never shifted from the prosecutor to the Defendant, right? That is they never have to present any evidence.

A. Right.

[State]: Do you understand that?

A. Right. I understand that they don't have to do anything.

[State]: And you can't hold that against them, right?

A. No, I can't.

[State]: Do you agree with that?

A. Yes, I do.

[State]: Because [defense counsel] asked you a bunch of questions earlier, and the way you answered them, you were basically putting the burden on them, and making them present evidence to you. Did you know that?

A. No, I did not know.

[State]: And then he said, "Do you feel real strongly about that?" And you said, "Yes, I do." And he said, "That's very important to you? And you said, "Yes, it is." But did you know when you were saying it was important and did you even know when he was asking those questions that what you were doing was shifting the burden to the Defendant to make him put evidence on to prove something to you when he doesn't have to?

A. No, I didn't realize that.

\* \* \*

[State]: And [defense counsel] was talking to you and he said, "Now, the prosecutor had the burden to prove [the first special issue] beyond a reasonable doubt," right?

A. Right.

[State]: And he said, "That can be done two ways. Maybe the prosecutor just didn't present enough evidence and you don't believe it beyond a reasonable doubt," right?

A. Right.

[State]: He said, "Or the prosecutor may present evidence and then the Defendant may choose to put on evidence that rebuts them, and then you don't believe it beyond a reasonable doubt because of the evidence they put on." Does that make sense?

A. Yes.

[State]: Do you remember him talking about that?

A.          Yes, I remember.

[State]:          But that never means that they have to put on evidence.

A.          Right.  I understand that.

[State]:          So then he said, "Now, if you found beyond a reasonable doubt that a person is guilty of capital murder."

A.          Okay.

[State]:          And then you believe beyond a reasonable doubt that a person is probably going to commit future acts of violence, then the law says we still have to go to question No. 2, right?

A.          Right.

[State]:          But what you told him was unless they put on evidence, then you're always going to find the death penalty?

A.          I didn't know I did that.

[State]:          You basically said, "They better put on evidence to me that he's not a future danger, otherwise I'm always going to find for the death penalty," all right?

* * *

Do you see where you were shifting the burden to them?

A.          I didn't realize I did.

* * *

[State]:          I just want to make sure that you understand the process.

A.          Yeah, I understand that [the defense] don't have to do anything. You do your thing, you rest.  And if they want to, we go do our thing, because they don't have to say anything, because you have to prove everything.  I understand that.

Other exchanges followed in which Newton seemed to vacillate again. Finally, the State and the Defense attempted to clarify Newton's responses. Newton explained that he thought the questions assumed that the State had already proven to him beyond a reasonable doubt that the defendant was a future danger—it was at that point, he believed defense counsel was asking him whether he would consider the defense's evidence to make him change his mind:

> [Defense]: – is your answer to the first special issue, whether or not they're probably a future danger, that you're always going to answer that yes just because of the very nature of the case unless the Defense can bring you evidence to show otherwise? And you answered yes to that twice.
>
> A. But I said yes to that twice because I thought you were saying that the Defense would bring evidence to sway me. Do you understand where I'm coming from.
>
> [Defense]: I understand where you're coming from. My question was, would you require the Defendant to bring you evidence to show you, to make you say no?
>
> A. No.
>
> * * *
>
> Okay. I thought you said if my answer was yes could – would the – could the Defense sway me by bringing – by bringing some –
>
> [Defense]: Uh-huh.
>
> A. – evidence. Not that you're required to bring any evidence.
>
> * * *

[Defense]: All right. Well – and my question both times was, you know, are you going to answer that question yes, unless you can be convinced otherwise by the Defense? I mean that was basically –

A. Well –

[Defense]: – the question.

A. Okay.

[Defense]: And you said yes, okay? And you said that twice. But what – and let me – so what you're telling me now, though, is you thought I was saying if your answer to that question was going to be yes, could you be swayed by Defense evidence?

A. Right.

[Defense]: That's what you thought I was asking?

A. That's what I thought you were asking.

As Rodriguez admits, Newton understood the State had the burden to prove up the first special issue. Regarding whether Newton required the defense to present evidence, the record shows that while Newton's testimony appeared to vacillate, he was able to finally explain his responses during the close of his voir dire. The trial judge was in the best position to evaluate Newton's demeanor and interpret his responses. In doing so, the trial judge did not abuse his discretion in denying the challenge for cause to Newton. Point of error sixteen is overruled.

The trial judge did not abuse his discretion regarding Arnn, Desha, and Newton. Because Rodriguez failed to show that at least four of his complained-of challenges for cause

were erroneously denied, he cannot show harm on appeal.[54]  Therefore, points of error seventeen, eighteen, twenty, and twenty-one pertaining to prospective jurors Uselton, Stewart, and Cook are also overruled.

### Death-Penalty Issues

In point of error twenty-three, Rodriguez argues that "the punishment instructions improperly nullify the elements of future dangerousness allowing an affirmative finding on that issue not based on an honest assessment of future danger" thereby violating his Sixth, Eighth, and Fourteenth Amendment rights.  Specifically, he complains about the following statutorily required portion of the punishment charge:

> In deliberating on Special Issue No. 1, the jury shall consider all evidence admitted at the guilt or innocence stage and the punishment stage, including evidence of the defendant's background or character o[r] the circumstances of the offense that militates for or mitigates against the imposition of the death penalty.[55]

Rodriguez contends that this instruction acts to nullify all punishment evidence because it allows the jurors to consider the evidence from the guilt phase.  He claims that jurors can never divorce themselves from the facts of the offense enough to consider mitigating evidence, therefore, these instructions "return [him] to the *Furman*[56] problem that the death penalty can be 'wantonly' imposed moving away from, not toward individualized, structural

---

[54]  *See Feldman,* 71 S.W.3d at 748; *Penry v. State* (*Penry I*), 903 S.W.2d 715, 732 (Tex. Crim. App. 1995).

[55]  *See* TEX. CODE CRIM. PROC. art. 37.071 § 2 (d)(1).

[56]  *Furman v. Georgia*, 408 U.S. 238 (1972).

sentencing demanded by the 8th and 14th amendments."

We interpret Rodriguez's argument to mean that he believes that the jury should not be allowed to consider the crime he is being punished for committing when determining the punishment for that very crime. This argument is illogical. Nothing is more relevant to the punishment decision than the crime itself.

Texas Code of Criminal Procedure Article 37.071 Section 2(a)(1) authorizes the introduction of any evidence relevant to sentencing, including the circumstances of the offense. The first special issue deals specifically with whether the defendant will commit criminal acts of violence that would constitute a continuing threat to society. Rodriguez does not explain how the facts of the offense are not relevant to this determination. As noted previously, the jury is entitled to consider all the evidence presented at the guilt phase of the trial, in addition to the evidence presented at the punishment phase.[57] The circumstances of the offense and the events surrounding it may even be sufficient in some instances to sustain a "yes" answer to the future dangerousness special issue.[58] This is well-settled law, and Rodriguez raises no arguments to cause us to change it.

Regarding Rodriguez's assertion that the complained-of instruction pertaining to the first special issue acted as a "nullification instruction" such as the one disavowed in *Penry*

---

[57] *Banda*, 890 S.W.2d at 51; *Valdez v. State*, 776 S.W.2d 162, 166-67 (Tex. Crim. App. 1989).

[58] *Banda,* 890 S.W.2d at 51; *see also Hayes v. State,* 85 S.W.3d 809, 814 (Tex. Crim. App. 2002).

*II*,[59] this argument is also without merit. Unlike in *Penry II*, the jury here was provided with a vehicle to consider any and all mitigating evidence presented. We have repeatedly held that the instructions in the current capital sentencing statute allow the jury to give meaningful consideration and effect to mitigating evidence in accordance with clearly established federal law.[60] Rodriguez provides us with no new argument that persuades us to reconsider our holdings. Point of error twenty-three is overruled.

In points of error twenty-six through thirty-one and thirty-five through forty-one, Rodriguez raises various constitutional challenges to Texas' death penalty statute. In point of error twenty-six, he claims that the punishment instructions (arguing *Caldwell v. Mississippi*,[61] and referring to the "12-10 rule") lessen each juror's responsibility to make an individualized decision in violation of the Eighth and Fourteenth Amendments. In point of error twenty-seven, he complains that the punishment instructions violate the Eighth and Fourteenth Amendments "by improperly instructing jurors not to be swayed merely by sentiment, conjecture, sympathy, passion, prejudice, public opinion or public feeling thereby limiting the scope of mitigating evidence which can be considered." In point of error twenty-eight, Rodriguez asserts that the punishment instructions do not permit a discretionary act of mercy as a response to mitigation consideration. In point of error twenty-nine, he contends

---

[59] *Penry v. Johnson* (*Penry II*), 532 U.S. 782, 800 (2001).

[60] *See Busby v. State*, 253 S.W.3d 661, 667 (Tex. Crim. App. 2008); *Saldano v. State*, 232 S.W.3d 77, 100, 107-09 (Tex. Crim. App. 2007).

[61] 472 U.S. 320 (1985).

that the instructions impermissibly limit the scope of mitigation evidence, which reduces a defendant's moral blameworthiness. In point of error thirty, he complains that the instructions fail to explain the scope of mitigation evidence that may be considered because the term "mitigating evidence" is not defined. In point of error thirty-one, he asserts that the punishment instructions unconstitutionally limit the scope of mitigating evidence by defining it as evidence that reduces the defendant's moral blameworthiness because youth, family background, and future potential do not reduce moral blameworthiness.

In point of error thirty-five, Rodriguez complains that the State does not have to negate, beyond a reasonable doubt, the existence of a circumstance that would justify a sentence of life rather than death, in violation of *Ring v. Arizona*.[62] In point of error thirty-six, he argues that the Texas death penalty statute is unconstitutional because *Apprendi v. New Jersey*[63] and *Ring* require that the special issues be alleged in the indictment. In point of error thirty-seven, he complains that the trial judge erred in overruling his objections to the charge because the indictment failed to allege that the death penalty was being sought, in violation of *Apprendi*. In points of error thirty-eight and thirty-nine, Rodriguez contends that his rights were violated when the trial judge failed to instruct the jury regarding the definitions of "probability," "criminal acts of violence," and "continuing threat to society." In point of error forty, he asserts that the "12-10 rule" in Texas Code of Criminal Procedure

---

[62] 536 U.S. 584 (2002).

[63] 530 U.S. 466 (2000).

Article 37.071 violates his rights under the Eighth and Fourteenth Amendments. In point of error forty-one, he contends that he was harmed by the failure of the trial judge's instructions to advise the jurors of the results of being unable to reach a unanimous verdict as to the special issues.

Rodriguez concedes that we have previously rejected each of these arguments.[64] We decline his invitation to review our prior decisions on these issues. Points of error twenty-six through thirty-one and thirty-five through forty-one are overruled.

### Motion to Suppress

In his forty-second point of error, Rodriguez contends that the trial judge erred in denying his written motion to suppress all evidence recovered because Lubbock authorities discovered his identity by illegally obtaining his debit card records via a federal subpoena. Specifically, he complains that the federal and state law enforcement authorities violated the federal Right to Financial Privacy Act ("RFPA")[65] when the FBI gave the information obtained through the federal subpoena to the Lubbock police. He argues that, without the information from the debit card records, there would have been no probable cause to issue arrest or search warrants, and therefore, all evidence should have been excluded under Texas Code of Criminal Procedure Article 38.23.

After a hearing on Rodriguez's suppression motion, the trial judge filed written

---

[64] *See Saldano,* 232 S.W.3d at 104-09; *Russeau v. State*, 171 S.W.3d 871, 885-86 (Tex. Crim. App. 2005); *Prystash*, 3 S.W.3d at 536-37.

[65] 12 U.S.C. § 3401 et seq. (2005).

findings of fact and conclusions of law. Rodriguez raises no complaint that the trial judge's

findings are not supported by the record. The trial judge's findings are as follows:

> On September 13, 2005, the body of Summer Baldwin was found inside a suitcase at the Lubbock landfill. The suitcase was new and contained a UPC bar code. Investigators determined that the brand of suitcase was sold at local Wal-Mart stores. Investigators further discovered that two suitcases of that brand and style had been bought at a local Wal-Mart on September 12, 2005. Tal English, a Lubbock Police Department detective, obtained debit/credit card numbers for the two transactions. Detective English took that information to a local bank, whereupon he received the name of the two financial institutions which issued the cards. Detective English contacted one of the institutions by telephone, and spoke with Patrick Beaty, a risk management manager for the Pacific Marine Bank in San Diego, California. Mr. Beaty would not provide details regarding the account without a subpoena.
>
> The FBI was also involved in the murder investigation because Summer Baldwin was a witness in a federal prosecution involving a defendant named Richard Corder; thus, officers at the FBI had a reasonable suspicion that Richard Corder was a possible suspect in the murder. Indeed, Summer Baldwin had given a statement against Richard Corder, and Mr. Corder had a warrant for his arrest at the time of the murder. Shannon Fish, an FBI agent, and assistant United States attorney Jeffrey Haag prepared a grand jury subpoena for the banking records from Pacific Marine Credit Union. The Lubbock Police Department detectives were assisting Jeffrey Haag with his investigation into the murder involving a federal witness. Therefore, Lubbock police officers were working in conjunction with assistant U.S. [attorney] Jeffrey Haag to assist in performing that attorney's duty to enforce federal criminal law. On September 14, 2005, the subpoena was issued by a federal grand jury. The California bank then provided [Rodriguez's] name, address, and locations where the card had been recently used. This information was sent to Agent Fish, whereupon he turned the information over to an LPD officer. This information was sent to Lubbock Police Department officers as they were assisting in the federal investigation. Richard Corder was not ruled out as a suspect solely on the basis of obtaining [Rodriguez's] name. [Rodriguez's] name was known to investigators investigating Joanna Roger's [sic] death, which was also the subject of a federal grand jury.
>
> In reviewing a trial judge's ruling on a motion to suppress, an appellate court must

view the evidence in the light most favorable to the trial judge's ruling.[66] When a trial judge makes explicit fact findings, the appellate court determines whether the evidence, viewed in the light most favorable to the trial court's ruling, supports these fact findings. The appellate court then reviews the trial judge's legal ruling *de novo* unless the trial judge's supported-by-the-record explicit fact findings are also dispositive of the legal ruling.[67] We will uphold the trial judge's ruling if it is supported by the record and is correct under the applicable law.[68]

Rodriguez argues that the complained-of evidence should have been excluded under Texas' exclusionary rule, Article 38.23. Article 38.23, which pertains to evidence that is "obtained . . . in violation of any provisions or laws . . . of the United States of America." The RFPA restricts the federal government's ability to obtain access to an individual's financial records.[69] When such records are sought in connection with a federal grand jury proceeding, the effect of the RFPA is to bring them under the secrecy safeguards of grand jury proceedings generally.[70] Rule 6(e) of the Federal Rules of Criminal Procedure

---

[66] *State v. Kelly*, 204 S.W.3d 808, 818 (Tex. Crim. App. 2006).

[67] *Id.* at 818.

[68] *See State v. Ross*, 32 S.W.3d 853, 855-56 (Tex. Crim. App. 2000); *Romero v. State*, 800 S.W.2d 539, 543 (Tex. Crim. App. 1990).

[69] 12 U.S.C. § 3401 et seq.

[70] 12 U.S.C. § 3420 (a)(2); *see also United States .v Kington,* 801 F.2 733, 737 (5th Cir. 1986).

authorizes the disclosure of grand jury matters to any government personnel, including those of a state or state subdivision, that a government attorney considers necessary to assist in performing the duty to enforce federal criminal law.[71]

Here, Rodriguez does not allege that the federal authorities obtained his financial information unlawfully. Rather, he challenges the transfer of this information from federal authorities to Lubbock authorities. However, Lubbock authorities lawfully obtained this information under Rule 6(e) because they were assisting an assistant U.S. attorney in the investigation of a federal crime. Therefore, Article 38.23 does not apply.

To the extent that Rodriguez is complaining about the retention and eventual use of the financial information, Article 38.23 still does not provide a remedy. The "obtaining" of an item is not a continuing act.[72] The Lubbock authorities' use of the financial information to obtain search and arrest warrants, even if in violation of the RFPA's provisions,[73] "does not vitiate the status of such evidence as having been legally obtained."[74]

The trial judge did not err in denying Rodriguez's motion to suppress. Point of error forty-four is overruled.

---

[71] FED. RULE CRIM. PROC. 6(e)(3)(A)(ii).

[72] *See Martinez v. State*, 17 S.W.3d 677, 686 (Tex. Crim. App. 2000) (evidence moved in violation of law was not "obtained" in violation of law because seizure was already complete).

[73] 12 U.S.C. § 3420(a).

[74] *Martinez*, 17 S.W.3d at 686; *see also Johnson v. State*, 871 S.W.2d 744, 751 (Tex. Crim. App. 1994).

We affirm the trial court's judgment.


DELIVERED: March 16, 2011
DO NOT PUBLISH